Charles R. **BARBER**, Jr., Plaintiff,

v.

**INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILD-ERS, BLACKSMITHS, FORGERS & HELPERS, Defendant.**

Civ. A. No. 82–C–2668–S.

United States District Court,
N.D. Alabama, S.D.

Dec. 31, 1986.

Carol Ann Rasmussen, Birmingham, Ala., for plaintiff.

George C. Longshore, Birmingham, Ala., Joseph Moreland, Kansas City, Kan., for Intern. Boilermakers.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON REMAND

CLEMON, District Judge.

### Introduction

The United States Court of Appeals for the Eleventh Circuit has vacated the earlier judgment entered by this Court,[1] and remanded for "further proceedings and additional findings." The parties have since engaged in further discovery; and the pretrial order has been amended, granting defendant leave to assert an additional position and to supplement its trial exhibits. A remand hearing was held on July 21, 1986; and at the conclusion of the hearing, the Court required the defendant to supplement the record with its original inter-office memoranda concerning the job and rate assignments of white employee William C. Burroughs.[2] These documents have been provided to the Court and received in evidence. Based on the entire record, the testimony and exhibits received into evidence at the July 21 hearing, and the defendant's inter-office memoranda received into evidence, the Court now makes and enters the following Findings of Fact and Conclusions of Law.

### The Prima Facie Case

1. The Court adopts all of its earlier findings which were not set aside on appeal,[3] together with the findings incorporated in the reported decision of the Circuit in this case.

2. New evidence, subsequent to the Circuit's decision, indicates that John Sharit did not "receive his 8000 hours in February or March of 1980, qualifying him for the 100% rate." 778 F.2d at 758. An October 21, 1980 Office Memorandum of defendant shows that as of that date, Sharit was classified by the union as a probationary employee or trainee; a September 9, 1981, Office Memorandum reflects that as of that date, Sharit was still classified a trainee, although he was being paid at the 100% rate. CX 2, 3.

3. James Ray was admitted as a full-fledged boilermaker based on his membership in the National Transient Division.[4]

---

1. *Barber v. International Bro. of Boilermakers,* 778 F.2d 750 (11th Cir.1985).

2. At the original trial, plaintiff had identified Burroughs as one of the white employees who were "as qualified or less qualified than the plaintiff [and] were treated differently than plaintiff." Court's Exhibit 1, p. 5.

3. Among other things, the Court found that subsequent to June 30, 1980, the defendant continued to refer plaintiff to jobs at the 80% rate, while similarly situated whites were referred to those jobs at the 100% rate. Tr. 155. The Court further found that as of the date of trial, plaintiff should have accumulated 8000 hours. Tr.

156. It found that plaintiff should have been referred out at the 100% rate as of September 3, 1981 "because of his prior experience, [which was set aside by the Circuit] his exemplary performance of his duties, his mastery of the skill or art of welding and his rigging proficiency." Tr. 156, 157. While the Court specifically mentioned John Sharit, James Ray, and Damon Temple, it never indicated that they were the only similarly situated white employees.

4. The Union official who initially classified Ray testified on remand that his decision was based on the representation that Ray was an NTD member with extensive experience. But where

Like Ray, plaintiff became a member of NTD in 1980. Unlike Ray, when plaintiff advised the union of his NTD membership, he was told that it did not alter his trainee status.

4. With only one exception, the defendant has referred every white NDT member to jobs at the 100% boilermaker rate, without regard to whether employee has completed 8000 hours of a training program.

5. John C. McGhee, a white member of the defendant union, did not attain the requisite 8000 hours of boilermaking training until April, 1982. He had not worked at the 100% boilermaker rate prior to 1980. In October 1981, January 1982, and again in March 1982, he was referred to jobs as a trainee at the 100% boilermaker rate.

6. Under the "grandfather clause", a union member who had been allowed to work at the 100% boilermaker rate prior to the time that the Local Lodge Rules were revised, is entitled to continue being referred to jobs at the 100% rate even though he has not accumulated 8000 hours. PX 12, p. 3; PX 46, pp. 24–27. The Local Lodge Rules were revised as of May 19, 1978. DX 7, p. 22.

7. According to the union, grandfathered boilermakers are entitled to that status because they were paid at 100% of the boilermaker rate prior to November 1, 1979. CX 1, p. 9.

8. The defendant union has stipulated that prior to November 1, 1979, plaintiff worked three jobs at the 100% boilermaker rate. CX 1, p. 2.

9. William C. Burroughs, a white union member, was referred to a job at the 100% boilermaker rate on only one occasion prior to November 1, 1979, and he worked that job for only two days. PX 15. Between June 30, 1980 and Febuary 6, 1982, Burroughs was referred to jobs at the 100% boilermaker rate on at least seven occasions—while he remained classified as a trainee. PX 15. As of March 1, 1982,

Burroughs was reclassified as a boilermaker, which entitles him to the 100% rate. As of April 11, 1986, Burroughs was still nearly 400 hours short of the requisite 8000 hours. PX 15.

10. On four occasions prior to November 1, 1979, white union member Ted W. Gerrard was referred to jobs at the 100% boilermaker rate, although his primary job class was that of a 70% trainee. From September 16, 1979 to December 1, 1979, Gerrard worked as a 100% trainee. Since June 30, 1980, he has been consistently referred to jobs as either a 100% trainee or a full-fledged boilermaker. As of April 11, 1986, notwithstanding the many hours he has worked as a boilermaker, he had still not accumulated the requisite 8000 hours. PX 22.

11. White union member William Clifford James was initially assigned as a boilermaker in 1977; but as of September 1979, he is shown in the union's records as having been referred to jobs as a 100% trainee. On four occasions since June 30, 1980, he is shown as having been referred as a 100% trainee; on all other occasions, he is shown as a full-fledged boilermaker. But as of April 11, 1986, he had accumulated little more than half (4,764.20) of the requisite 8000 hours for boilermaker status. PX 27.

12. White union member Carl W. Arrington was referred to jobs at the 100% trainee rate on three occasions prior to November 1, 1979; and he was once referred as a full-fledged boilermaker. After June 30, 1980, he continued to be referred as a 100% trainee until February 6, 1982. Beginning on February 22, 1982, Arrington was referred to jobs as a full-fledged boilermaker. He did not acquire the requisite 8000 hours until sometime after January 5, 1984. PX 13.

13. Although plaintiff did not tell the union of his previous boilermaker experi-

credit for experience is sought, "... the Union cannot allow that credit without back-up documentation to support its having done so." PX 4. It is undisputed that the union never sought any

such documentation from Ray, and he never furnished any. The Court credits Ray's testimony on remand that the focus of the union official's inquiry was Ray's NTD membership.

ence at the time he applied for membership, the union was aware of this experience after June 30, 1980. The union was, at all material times, aware that subsequent to the time he joined the union, plaintiff undertook extensive training in welding, both on-the-job and formal courses, including the completion of a course in advanced welding at a welding school in Ohio.

### The Defendant's Rebuttal

14. The defendant has not offered any explanation for its post-June 30, 1980 referrals of John Sharit at the 100% rate.

15. The defendant asserts that Ray was initially classified at the 100% rate because he told the union that he was an NTD member and that he had substantial welding experience.

16. The defendant asserts that plaintiff's membership in NTD did not entitle him to the 100% rate.

17. The union's apparent explanation for the different treatment accorded to John McGhee, William Burroughs, Ted Gerrard, and William Jones is that they are covered under the grandfather clause.

18. The union asserts that plaintiff failed to demonstrate his rigging proficiency.

19. The defendant has articulated valid, non-discriminatory reasons sufficient to rebut plaintiff's *prima facie* case with respect to his alleged rigging proficiency and with respect to white union members James Ray, John C. McGhee, William C. Burroughs, Ted Gerrard, and William Jones.

20. The union has not rebutted plaintiff's *prima facie* case with respect to John Sharit.

### The Showing of Pretext

21. The defendant's explanation that the disparate treatment of James Ray is attributable to his prior experience as a welder is unworthy of credence. When plaintiff sought credit for prior experience, he was told that such experience must be documented before it can be credited. As found earlier, no such documentation was ever sought from or provided by Ray. Moreover, the defendant was aware that plaintiff had extensive training and experience as a welder, acquired subsequent to his initial membership, but it never referred him to jobs at the 100% rate after it acquired such knowledge. The "prior experience" explanation is, moreover, a pretext for discrimination.

22. The defendant's explanation that plaintiff's NTD membership did not entitle him to the 100% rate is both unworthy of credence and a pretext for discrimination. On his NTD membership alone, Ray was sent out at the 100% rate—as were 99% of all the other white NTD members.

23. The defendant's explanation that John McGhee, William Burroughs, Ted Gerrard, and William Jones were referred at the 100% rate is a pretext for discrimination. Without dispute, plaintiff is also entitled to the grandfather exemption, based on his having worked at the 100% rate on three occasions prior to November 1, 1979.

24. The plaintiff has not shown, by a preponderance of the evidence, that the explanation for the defendant's denial of credit for his alleged rigging proficiency is either unworthy of belief or a pretext for discrimination.

### Conclusion

Based on the foregoing Findings of Fact and Conclusions of Law, it is the opinion of the trier of fact that plaintiff has carried his ultimate burden of proving that susequent to June 30, 1980, the defendant failed to refer him to jobs at the 100% boilermaker rate because of his race or color.

### JUDGMENT

Based on the accompanying Findings of Fact and Conclusions of Law, it is the JUDGMENT of the Court that plaintiff CHARLES R. BARBER, JR., shall have and recover of defendant INTERNATIONAL BROTHERHOOD OF BOILERMAK-

ERS, IRON SHIPBUILDERS, BLACK-SMITHS, FORGERS AND HELPERS, the relief previously ordered by the Court in its Final Judgment and Injunction of November 30, 1983, and in its Order Authorizing Attorney's Fees entered on August 24, 1984.